## HOME HEALTH SERVICES, et al. v STATE OF FLORIDA, DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES
### (Consolidated)

Case No. 85-1377R

State of Florida, Division of Administrative Hearings

March 12, 1986

### APPEARANCES OF COUNSEL

**John H. Park, Jr.** and **Thomas D. Watry, Parker, Hudson, Rainer and Dobbs,** for petitioner, Home Health Services and Staffing Association and Kelly Health Care, Inc. (Home).

**Leonard A. Carson** and **Robert P. Daniti, Carson and Linn, P.A.,** for petitioner, Gulf Coast Home Health Services of Florida, Inc., and Intervenor, Florida Association of Home Health Agencies, Inc. (Gulf Coast and FAHHA).

**Frank Matthews, Hopping, Boyd, Green and Sams,** for petitioner Associated Home Health Agency (Associated).

**John F. Gilroy,** Assistant General Counsel, for respondent State of Florida, Department of Health and Rehabilitative Services (HRS).

**Byron B. Mathews, Jr., McDermott, Will and Emery,** for intervenor

Mt. Sinai Medical Center/Miami Jewish Home and Hospital for the Aged Home Health Agency, Inc. (Mt. Sinai).

**R. Andrew Rock, Carlton, Fields, Ward, Emmanuel, Smith and Cutler,** for intervenor Upjohn Health Care Services, Inc. (Upjohn).

## OPINION

CHARLES C. ADAMS, Hearing Officer.

### FINAL ORDER

Notice was provided and on September 18 and 19 and September 23 and 24, 1985, a formal hearing was held before Charles C. Adams to consider the validity of a proposed rule of the respondent agency. In late January 1986, the parties, in the person of counsel, offered proposed final orders in aid of the preparation of the final order in this cause. Those proposals have been considered and suggested facts set forth in those proposals are distinguished in an appendix to this final order.

### ISSUE

The issue is the consideration of the validity of proposed Rule 10-5.11(14), Florida Administrative Code.

### FINDINGS OF FACT

#### I. BACKGROUND

1. The named Petitioners in these actions petitioned the Division of Administrative Hearings seeking a determination of the validity of proposed Rule 10-5.11(14), Florida Administrative Code, in accordance with Section 120.54(4), Florida Statutes. Those actions were subsequently consolidated for purposes of final hearing. The cases were originally scheduled to be considered on May 24, 1985, but by stipulation of all parties the hearing was continued until the September 1985 hearing dates. By this stipulation the parties have waived time limitations set forth in Section 120.54(4), Florida Statutes.

2. Those Intervenors as identified in the style of this action had requested the right to participate in the proceedings, which requests were granted.

3. All Petitioners and Intervenors, in the course of the final hearing, either by stipulation or proof have demonstrated their standing to participate in the hearing to consider the validity of proposed Rule 10-5.11(14), Florida Administrative Code.

4. The challenges to the subject rule as offered by the Petitioners

were timely made. Likewise, the requests for intervention made by the Intervenors were timely.

5. The present proposed Rule 10-5.11(14), Florida Administrative Code, has been drawn in an effort by HRS to replace the former Rule 10-5.11(14), Florida Administrative Code, which had been found invalid in the case of *Johnson and Johnson Home Health Care, Inc. v. Department of Health and Rehabilitative Services*, 7 FALR 449 (August 18, 1983), as affirmed in the opinion rendered by the First District Court of Appeal, *Department of Health and Rehabilitative Services, et al. v. Johnson and Johnson Home Health Care, Inc.2rf*, 447 So.2d 361 (Fa. 1st DCA 1984). *In pertinent part the former rule stated:*

(14)(a) A Certificate of Need for a proposed new home health agency or sub unit shall not be issued until the daily census of each of the existing home health agencies or sub units providing services within the health service area of the proposed new home health agency or sub unit has reached an average of 300 patients for the immediate preceding calendar quarter unless the need for the proposed new home health agency or sub unit can be demonstrated by application of the mitigating and extenuating circumstances in Rule 20-5.11(14)(b) herein.

(b) Mitigating and extenuating circumstances which must be met for the department to issue a Certificate of Need for a proposed new home health agency or sub unit even though the previously described need determination procedure does not clearly indicate needs are:

1. Documentation that the population of the proposed service area is being denied access to home health care services in that existing home health agencies or sub units within the proposed area are unable to provide services to all persons in need of home health care, or

2. Documentation that approval of such proposed new home health agency or sub unit would foster cost containment for all providers in the health service area.

6. With the advent of the declaration of rules invalidity related to former Rule 10-5.11(14), Florida Administrative Code, and feeling the need to promulgate a substitute rule, HRS, through the Office of Comprehensive Health Planning, undertook the promulgation of the subject proposed Rule 10-5.11(14), Florida Administrative Code. To this end, Marjorie F. Turnbull, Deputy Assistant Secretary for Health Planning, initiated the rulemaking process by convening a meeting of interested parties in April 1984. Ms. Turnbull exercised the general

administrative oversight in this rulemaking process. Phillip C. Rond III, Administrator of the Office of Comprehensive Health Planning, was primarily responsible for the development of the proposed rule. His participation included an analysis of data and substantive decision making on the text of the rule. The ongoing responsibility for the rule development was that of Sharon Gordon-Girvin, Health Planning and Development Coordinator.

7. To assist in the process, HRS convened a work group to consider alternatives in rule development. The work group was constituted of disparate interests in the home health industry, to include some of the private parties to this action. While the work group was in session, a number of need calculation formulas or methodologies were considered.

8. HRS had not committed and could not commit to bind itself to an arrangement in which workshop members controlled the ultimate decision on the matter of rule enactment. The work group acted as advisor to HRS.

9. When considering its course of action, HRS had in mind a basic outcome which took into account availability of data at the Office of Health Planning and Development, that is, data available on a routine basis; the creation of a quantifiable and defensible methodology; the desire to formulate an uncomplicated methodology; and interest in establishing policies consistent with other Office of Health Planning and Development policies and rules.

10. The state policy goals in the rule development, as made manifest to the group members, concerned quality of care, assurance of access to indigents, designation of geographical service areas (moving from a county basis to a district basis), the opening up of competition in home health care and use of case load analysis as opposed to need-estimating as an approach to addressing the delivery of home health care. Unfortunately, those goals are not attained through the proposed rule.

11. The aforementioned topics were examined by questionnaires submitted to the work group members. In addition, several proposed methodologies that might be used in creation of the home health rules were examined.

12. Those methodologies were exercised in group meetings and group members were also provided printouts related to need calculations performed by HRS in the use of each of the methodologies.

13. In the course of the workshop meetings, the subject of smallest acceptable operating unit in terms of economies of scale was discussed (cost containment as a function of agency size) together with differ-

254

ences between the size of home health agencies found in urban and rural areas. The subject of indigent health care was also examined. This discussion included the possible use of county health units in serving Medicare patients as a means to promote service to Medicaid patients.

14. All told, there were four work group sessions, the last of which was held on October 31, 1984. In the course of that session, an examination was made of a draft version of the proposed new rule. In this draft document, the smallest ultimate agency size was described as:

S = the number of expected Medicare visits per year per agency is obtained by adding to the base agency size of 15,000 visits an additional number of visits equal to the total number of Medicare visits in the projected year within a district divided by the base Medicare annual visits per agency multiplied by 1% of the base Medicare annual visits per agency.

15. The October 1984 draft rule had a description of location of the home health agencies which was substantially the same as that set forth in the proposed rule under consideration.

16. The draft proposal of October 1984 contained language which is similar to Subsection (e) of the proposed rule allowing for existing licensed agencies to continue to serve more than one district upon successful certificate of need review, by allowing these existing agencies to create a new agency or sub unit in the adjacent district. This October draft set forth a minimum volume of visits which must be demonstrated in order to retain licensure in the adjacent district. This feature is not set forth in the proposed rule.

17. The October 1984 draft of the rule contained the opportunity for county health units to be granted limited certificates of need to serve Medicare patients. That draft limited the participation to 1,500 Medicare visits, whereas the proposed rule in Subsection (f) speaks in terms of 900 visits as a limitation.

18. As with other matters under discussion, there was no consensus among the work group members as to the propriety of the draft rule of October 1984.

19. Following the last meeting of the work group session, a further rules draft was prepared in December 1984. In this draft the so-called "S" factor related to minimum agency size is modified. This December draft proposal also sets forth the idea of minimum documentation of service on the part of existing agencies who wanted to serve an adjacent district.

20. The December 1984 draft was more restrictive than the October

255

1984 draft in terms of recognition of additional home health agencies and the proposed rule is the most restrictive of all when contrasted with the prior drafts in describing the number of new agencies needed.

II. The Proposed Rule

21. On April 5, 1985, HRS published formal notice of its intent to adopt the present rule. The final version of the proposed rule contained a number of provisions that were substantially different from those which the work group had considered in its role as advisory body to the agency.

22. The purpose and effect of the rule is described as:

This amendment to rule 10-5.11(14) revises the department's methodology for determining the need for home health agencies seeking Medicare certification. Since Medicare certification is a prerequisite for an agency's participation in the Florida Medicaid Program, this rule affects those home health agencies desiring to be reimbursed by the Medicaid Program. The proposed amendment is promulgated based upon statutory requirements specified in Chapter 381.494(7), Florida Statutes, requiring the department to develop statewide uniform methodologies. In addition, the proposed amendment is in response to a final judgment of the First District Court of Appeal which declared the Rule 10-5.11(14) invalid. In response, the department proposes the amendment.

23. The rule was summarized as being:

As amended, this rule provides a method to allocate agencies based on projected population needs two years into the future. Population need is based upon prior utilization patterns of Medicare beneficiaries in Florida. Provisions in the rule address the net number of agencies to be authorized through the certificate of need program, define the service location, and specify the conditions under which an expedited review of an application for a certificate of need will be granted under two conditions: (1) for agencies serving more than one departmental district at the time of the rule's adoption, and (2) for county health units seeking to serve departmental clients not covered by Medicare or Medicaid.

24. The stated authority for the rule enactment was Section 381.494(5), (7), (8), and 381.03(1)(g)11., Florida Statutes. The proposed rule is an effort to implement the purposes of Section 381.494(7), Florida Statutes.

25. The rule gave a brief summary of the estimate of the economic impact caused by the enactment of the rule, and that impact was

256

further described in an HRS memorandum of August 21, 1985. See Mt. Sinai Exhibit 1 admitted into evidence.

26. The operative features of the proposed rule include Subsection 14(a) which states:

Need Methodology. In addition to relevant statutory and applicable rule criteria to be used in considering the population's use of Medicare-certified home health agencies, the Department will determine the projected use of such home health services and the number of agencies to be allocated according to the following methodology:

$$N - g - L$$

where,

- N = the net number of home health agencies to be allocated in the relevant departmental district;
- G = the gross number of home health agencies to be allocated in the relevant departmental district reduced to the nearest whole number;
- L = the number of licensed and approved home health agencies in the relevant departmental district.

$$G = (MV \times (A+B)/S)$$

where,

- MV = is the state mean number of visits standard per Medicare home health service user across age groups;

= 31.5

- A = the projected district population of persons 65 years of age or older (POPA) times the Florida Medicare home health services utilization rate standard for the population age 65 and over;

= POPA × .0496;

- B = the projected district population of persons 0-64 (POPB) who are estimated to be disabled times the Florida home health services utilization rate standard for disabled Medicare beneficiaries;

= POPB × .01755 × .0297;

- S = the number of expected Medicare visits per year per agency. S is obtained by adding to the base agency size of 9,000 visits a year an additional number of visits equal to the total number of Medicare visits in the projected year within a district divided

**257**

by the base agency size which is then multiplied by a factor denoted as C according to the following schedule: for applications timely filed in calendar years 1984 and 1985, agency size will be multiplied by 270; for applications time filed in calendar years 1986 and 1987, agency size will be multiplied by 225; and for applications timely filed in calendar year 1988 and onwards, the base agency size will be multiplied by 180. However, if the result of this computation exceeds 21,000 visits, S shall be assigned a value of 21,000.

$$= 9,000 + (MV \times ((A + B)/9,000) \times C);$$

27. As can be seen, the rule in its methodology contemplates the determination of the net number of agencies to be allocated to a given district by subtracting the number of licensed and approved agencies from the gross number of agencies to be allocated. In utilizing this formula "G" is rounded down to the nearest whole number. The effect of this arrangement is a reduction down to the whole number regardless of the size of the fraction found in operating the formula. This choice of rounding down cannot be justified. It is not rational. It understates the needs for home health agencies. In utilizing the rule's rounding down approach, as opposed to the more reasonable approach of rounding down in those instances in which the fraction of the whole number is less than 0.50, the formula reveals the number of agencies needed in 1987 as 185. By contrast, the traditional technique of rounding down yields 190 agencies.

28. Criticism was made of the reasonableness of the definition of "L." Having examined the facts of this case, that definition is found to be an acceptable depiction of existing providers.

29. In trying to arrive at the value "G" one must utilize, "MV", the mean number of visits per user. MV is reported as 31.5, and that corresponds to the number of visits per user in the year 1982. In arriving at the value of "A", which is the projected population of persons 65 and older multiplied by standard utilization rate, the year 1982 forms the basis for describing that utilization rate. The number .0496 as reported in the rule is an incorrect utilization factor for 1982. It should be .0506. HRS concedes that this correction is appropriate. In describing "B" pertaining to the projected district population of disabled persons 0-64 in need of home health services, the factors of utilization .01755 × .0297 are also premised upon 1982 utilization patterns.

30. HRS holds the point of view that there are fluctuations in the utilization rate, year to year, especially as it pertains to the years 1979 through 1983. Given what the Department believed to be fluctuations

258

in the number of home health visits in the subject years, the ability of existing agencies to assimilate additional visits in those periods of high utilization, the problems caused by approving a number of new agencies during those periods of peak demand and inefficiencies in those operations when a market softened, HRS thought it appropriate to use a base year in describing utilization. The year 1982 was selected by HRS as being a representative year for determining utilization. In picking the year 1982, HRS has not demonstrated that this year is typical or can be described as a median point within the stated hypothetical fluctuations of utilization. This idea of picking one year within the cycle, if the cycle of fluctuations has indeed occurred, seems incongruous. Depending upon whether the year 1982 the year 1982 was in a period of higher demand or lower demand, results of the use of that year as a basis for determining utilization would seem skewed. In fact, the cyclic fluctuations which HRS held to have occurred did not exist. Beginning in 1978 and for those years thereafter, utilization rates have consistently gone up. In 1983 those utilization rates for the state of Florida had increased over the 1982 rates in each of the subject categories. This revelation puts to question the idea of employing a static utilization rate in depicting need. (The year 1983 is examined in view of the fact that it is the most recent year in which comprehensive data is available to depict utilization rates within the select categories.)

31. In addition to the general trend of increased utilization, there is the influence of the implementation of prospective payment systems, referred to as "DRG-s" related to inpatient hospital care, which has increased the utilization of home health care.

32. To further emphasize the inefficacy of the choice of a static or fixed utilization rate based upon 1982, the comparison of the use of the 1982 utilization rate in the formula in describing the year 1984 to the actual statistics showing utilization patterns in 1984 reveals that the 1982 utilization rate basis grossly underestimates the number of home health visits; however, in the whole state it underestimates the number of visits. These circumstances are set forth in Home Exhibit 9 at page 4. In summary, the 1982 utilization miscalculates actual use by approximately 325,389 visits. This depiction does not take into account the possibility of additional hospital-based home health agency visits which would tend to exacerbate the miscalculation by the 1982 estimate by adding to the total of uncounted home health visits.

33. The problem of the use of a fixed year for describing utilization is further examined by reference to Table 6 within Home Exhibit 9 at page 10. In employing the methodology set forth in the proposed rule and updating the utilization data from 1982 to 1983, 220 agencies are

259

shown as needed in 1987, whereas 185 agencies would be shown as being needed if 1982 data was employed. Thus, 35 more agencies would be brought on if reference was made to the more appropriate 1983 data.

34. Finally, Subsection 14(a) to the rule uses 1982 as the basis for utilization rate and at the same time employs more up-to-date population statistics as called for by Subsection 14(b) to the proposed rule. This combination of using a fixed year utilization basis and updated population data further points out the irrational nature of this rule. On balance, taking into account the deference which is afforded an agency in its promulgation of rules and the realization that rules need not be perfect, reliance on 1982 as the base year for describing utilization rates cannot be supported. This failing is not saved by the Department's stated intention to review the standards set forth in the rule at some future date in an effort to ensure that they are realistic in their assumptions. They are not realistic in the beginning, and to review them in the future would not suffice. The only acceptable method would be to employ more up-to-date utilization rates in addition to the use of up-to-date population figures.

35. Furthermore, the misapplication of the utilization rate related to 65 and older, that is using .0496 as opposed to .0506 would cause a misstatement of the number of visits by shorting the formula 70,000 visits, which translates to at least three additional agencies.

36. Some of the rule challengers are critical of the rule methodology in that it uses a statewide utilization rate instead of referring to the historical experience in use of home health services within given districts. These parties emphasize historical differences in utilization of home health, district to district. Those differences relate to matters such as age, sex, and practice patterns in the delivery of home health care. One of the reasons the agency did not choose to further describe subgroups as to age or sex or related matters is due to the difficulty of data collection to make these calculations without placing an undue burden on the Department for that data collection. Having considered the criticisms, it was not manifestly unreasonable for the Department to fail to accommodate those differences within districts shown in the historical utilization patterns. The overall system of review described in Chapter 381, Florida Statutes, and an acceptable statewide home health rule methodology would be adequate to decide the issue of need. In any event, the concern of these parties on the topic of specific reference within the home health rule to the special needs of each individual district or the requirement to provide a saving clause within the rule

260

which allows necessary adjustment within those districts is problematic in that the rule is otherwise invalid.

37. In describing the number of expected Medicare visits per year per agency, "S", HRS makes the theoretical assumption that the size of the agency will be such that it affords between 9,000 and 21,000 visits per annum. HRS arrived at this position based upon its belief that there were ascertainable "peaks and troughs" in the data it had available to it in arriving at rule enactment, which data indicated some cost efficiency due to economies of scale occurring at intervals between 9,000 and 12,000 visits and again at 21,000 to 24,000 visits. The evidence presented in the hearing established that somewhere in the range of 6,000-10,000 visits economies of scale are realized. Beyond that point there do not seem to be any discernible cost benefits as the size of agencies increases in terms of number of visits performed. Those phenomena which HRS sees in terms of efficiency of economy of scale in the 9,000-12,000 visit range and 21,000-24,000 visit range are not found to exist. Therefore, although it may be appropriate to begin with the assumption that 9,000 visits is a representative idea of what one might expect to see in terms of the threshold for economies of scale, there is no reason to believe that those economies of scale will diminish beyond 21,000 visits per agency. Consequently, employing the rule and placing a cap at 21,000 visits, regardless of the fact that the computation describe higher numbers of expected visits, on the assumption that there are no further economies of scale above 21,000 expected visits is erroneous.

38. In arriving at the number of expected Medicare visits per year per agency, the rule takes the base agency size of 9,000 visits per year and adds an additional number of visits which is equal to the total number of Medicare visits expected in the projected year within that district and divides that number by the base agency's size. The result of this computation promotes a result which is different from one district to the next. Justification for this difference cannot be found in the record of this hearing. There is simply no available information which would explain the reasonableness of this choice of differentiating between the districts in terms of this aspect of the formula. Without such explanation, nothing in the language of the rule lends credence to the decision to create this differentiation. Furthermore, as mentioned above, if one were to assume that this difference is acceptable, there is no basis for placing a 21,000 visit cap on the product of the formula. Again, economies of scale are present beyond 21,000 visits.

39. In arriving at the answer to "S", the formula also employs a factor which is known as "C". That formula is graduated from the

years 1984 and 1985 in which the agency size is multiplied by the number 270, continues through the calendar years 1986 and 1987 in which the agency size is multiplied by the number 225, and finally concludes with the multiplication of agency size by the number 180 in the year 1988 and years beyond. HRS indicates the purpose of the graduated formula is to avoid overburdening the market place when this rule is first employed. HRS believes that given a long-standing freeze on the recognition of home health agencies within Florida, it would be ill advised to immediately flood the market place with new home health agencies when the rule takes effect. This formula by its terms avoids the recognition of any new home health agencies in the early years contemplated within the rule. By that result, it does defray any impact of the immediate introduction of a number of new home health agencies into the market place. However, HRS's reluctance to allow the immediate contribution of a number of new home health agencies in the setting where a long-standing hiatus has existed is intuitive at best, an intuition which cannot be upheld. There is no hard evidence which would tend to suggest that the decision to immediately bring on a number of home health agencies would adversely affect the delivery of health care in this realm. What makes this choice even more questionable is the rule's indefinite limitations on the number of additional home health agencies to be brought into the system. No reasonable explanation can be found for placing the brakes on expansion of the home health care industry for an undefined period of time.

40. The "S" factor does not promote a mix of efficient smaller agencies and efficient larger agencies as urged by the Department.

41. In summary, the "S" factor in the rule's methodology, to include "C", is not realistic in its assumptions. It is arbitrary and capricious.

42. Subsection 14(b) to the proposed rule states:

Population Projections. Population figures used in the need calculation will be for age-specific cohorts projected to reside in the relevant district on July 1 of the second year following the calendar year of the review cycle due date for which an application is timely filed. Projections to be used shall be those adopted at the spring Florida Revenue Estimating Conference and published by the Office of the Governor and in effect on the application submission deadline for the batching cycle in which a project is originally reviewed.

This subsection within the rule gives an indication of the intent to adopt population figures in effect at the date of submission of a CON application filed in the future. This arrangement contemplates the use of materials not in existence at the time that the rule is being adopted.

262

No indication was given in the course of the hearing that HRS intends to rely on Rule 1F-1.005, Florida Administrative Code, related to the publication by reference of the population information set forth in Subsection 14(b) of the proposed rule.

43. Subsection 14(c) to the proposed rule states:

Location of Home Health Agencies. Home Health services subdistricts shall be adopted by each Local Health Council according to guidance provided by the Department's Office of Health Planning and Development. These subdistricts shall be used by the Local Health Councils to identify priority locations for any new home health agencies determined to be needed under paragraph (a). Persons or corporations currently owning or operating a home health agency within a subdistrict shall not be eligible to obtain additional agencies or sub units within that subdistrict.

This provision calls for establishment of home health service subdistricts based upon Local Health Council action, with guidance from HRS. It calls for the Local Health Councils to use these subdistricts' boundaries to establish priority locations for incoming new home health agencies as ascertained by the use of Subsection (a) to the rule. It places a limitation on those entities that currently own or operate home health agencies within a subdistrict related to their eligibility to obtain additional agencies or sub units within that subject subdistrict. Those limitations are not warranted. In academic terms, if one were to employ the methodology in a comparative hearing in an instance in which the application for an additional home health agency in a given subdistrict was offered by an existing provider, the assumption is that the review process would protect against any monopolistic outcome favoring the existing provider. To prohibit the existing provider from filing an additional application based upon this provision is arbitrary and capricious.

44. Subsection 14(d) describes the service area that would exist upon the implementation of this rule as being:

Service Area. Licensed home health agencies shall be restricted to serving people residing within a single department district. A licensed home health agency may serve clients residing anywhere within the district but may not establish a branch office, maildrop, telephone service or other physical presence outside the subdistrict where the agency office is authorized to locate. Agencies authorized to serve counties in more than one subdistrict as of the effective date of the rule may maintain, but not expand their physical presence outside the subdistrict where its licensed office is located.

263

The provision calls for an arrangement in which the prime focus of the service moves from a county service area to that of a district service area. However, there are limitations placed upon the ability of the health agency to serve those clients in terms of establishing branch offices, mail drops, telephone service and other physical presence outside the subdistrict in which the agency has its office. While the idea of employing a system in which providers are allowed to serve their patients on a district-wide basis is an acceptable arrangement, the restriction on the future opportunities of the existing agencies as set forth in this provision is not acceptable.

45. Subsection 14(e) to the proposed rule states:

Multi-district agencies. As cited in the provisions of paragraph (d), home health agencies shall be restricted to providing service within a single department district. Any home health agency licensed as of the effective date of this rule to provide services within more than one departmental district will be given an opportunity to continue serving each district through the establishment of a new sub unit or a completely separate agency, subject to the limitations established in paragraphs (c), (d), and the remainder of this paragraph. The owners of agencies affected by this paragraph and who desire to continue serving more than one district must submit an application or applications for expedited review within 60 days of the effective date of this rule.

46. There presently exists a number of licensed home health agencies which in accordance with the terms of their licenses can serve more than one HRS district. Subsection 14(e) states that the limitations of Subsections (c) and (d) concerning expanded physical presence are envisioned in the operation of the former subsection; however, given the fact that the opportunity presented at Subsection 14(e) mandates the placement of a new sub unit or a completely separate agency where one did not exist before, there is an irreconcilable conflict between Subsections 14(c) and (d) and Subsection 14(e). Subsection 14(e) permits the existing agencies with so-called "cross-over rights" to serve any county within a subject district, whether the county was included on the original license or not and without regard for the degree of prior service in those counties which were included in their existing license. Unlike the circumstances with applicants who have no recourse under Subsection 14(e), it is unnecessary to reach a 9,000 visit threshold before gaining recognition to serve in the entire district.

47. More specifically, although the initial drafts of the proposed rule indicates that some threshold proof was necessary on the part of those

multiple-district providers before taking advantage of their "cross-over rights", the requirement is not set out in the proposed rule. Conse-, quently, it is uncertain what showing of prior service, if any, these multiple-district agencies would have to offer in the course of the expedited review mentioned in Subsection 14(e) to the proposed rule before obtaining a district-wide license in the "cross-over" district. Once an agency under the expedited review was accepted to give service district wide, in the absence of requiring that applicant to show a past history of providing service within the subject district and without apparent compulsion for the applicant to show future intentions to serve the district, the existing provider has preempted the opportunity for others to offer this service. This outcome is reached without subjecting the application of the existing provider to a comparison with a new applicant(s). It cannot be defended as a decision in recognition of the property rights of the existing provider. Those property rights are not that extensive. In the final analysis, this arrangement is contrary to the statutory requirements for comparative review of applications and constitutes an arbitrary infringement on the opportunity for new applicants to participate in the delivery of home health care.

48. The scope of the expedited review spoken to in Subsection 14(e) of the proposed rule is uncertain. One of the authors of the proposed rule, Mr. Rond, did indicate that the review was less stringent than the review pertaining to a new applicant. How the less stringent review is to be accomplished cannot be ascertained in reading the rule and was not described in the record of this hearing. As stated, this review process would occur outside the normal batching cycle and forecloses the opportunity of new applicants to demonstrate their entitlement to the grant of a certificate of need. Rond *has* indicated that the expedited review would utilize statutory criteria. There is disagreement between Rond and Gordon-Girvin on the idea of comparative review among "cross-over" applicants with Rond indicating there would be no comparative review among those applicants and Gordon-Girvin being of the opinion that there would be. The extent of the applicability of the rule's methodology set forth in Subsection 14(a) to the proposed rule in considering the applications of multiple-district providers is not clear. Regardless of the meaning of expedited review, when the multiple-district providers are afforded the right to expand their base of operation · in accordance with the terms of Subsection 14(e) to the proposed rule, they do so at the peril of new applicants for certificate of need, in that they are allowed to undergo certificate of need review first; to do so on an expedited basis; to do so without explaining the

amount of services that they have offered in the "cross-over" district in the past; and to expand into areas beyond the license opportunity which they now hold. The overall scheme is ambiguous and lacking in fundamental fairness.

49. Paradoxically, what appears to be a windfall for the existing providers within multiple districts can be an unreasonable burden. This result pertains when those providers who are duly licensed are required to exchange their license circumstance for an arrangement which they may not find feasible. This is especially true given the fact that Subsection 14(e) of the proposed rule requires the proposed rule requires the establishment of a physical presence in the way of a new sub unit or completely separate agency. Further, there is some question of whether the provider in the multiple districts would be successful in its quest for the new type of certificate and license arrangement. In essence, those entities might be surrendering their known rights for a denial of expanded rights which they might not desire in the first instance. In this connection, there is no law which states that the existing providers in the multiple district must perform some level of service in order to retain their present licenses. In summary, Subsection 14(e) to the proposed rule is not justified.

50. Subsection 14(f) to the proposed rule deals with county health unit participation in the provision of home health Medicare and attempts to use this recognition as a basis for granting services to Medicaid patients. It states:

County Health Unit Participation. The provisions listed below govern the special authorization of county health units as providers of home health services to Medicaid eligibles and other departmental clients.

1. A county health unit may be granted a certificate of need to establish a home health agency or sub unit of a statewide agency under the condition that the county health unit shall not provide more than 900 annual home health service visits reimbursed by Medicare.

2. Any county health unit granted a certificate of need under subparagraph 1. shall not be included in the determination of net need as defined in paragraph (a).

3. Applications filed by county health units under the provisions of this paragraph shall be noncompetitive and will be granted expedited review.

4. Agencies or sub units established under subparagraph (f) may not be sold or otherwise transferred.

266

5. County health units licensed by the state and certified by Medicare as home health agencies as of the effective date of this rule shall be included in the determination of net need as defined in paragraph (a), and shall not be limited in the number of Medicare visits they may provide as defined in subparagraph 2.

6. Any county health unit that wishes to exceed the limit on Medicare visits as defined in subparagraph 1. may apply for a certificate of need conforming to the conditions specified in paragraphs (a) through (e) above.

7. If the 1985 legislature approves revised Medicaid home health services reimbursement rates which equal or exceed the state's average Medicare cost reports for the 1982-83 year, individual county public health units may seek a certificate of need under the provisions of this paragraph to serve departmental clients who are not covered by Medicare or Medicaid payments and who have an annual income equal to or less than 150 percent of the United States Office of Management and Budget poverty level.

8. Prior to the approval of any county health units as home health care providers under the provisions of this paragraph, the Health Program Office shall develop an implementation plan and present it to the Statewide Health Council for review. The plan shall address at a minimum the following components: criteria for county public health unit participation in the home health services program; system for claims processing; standards of practice in home health services; qualifications of personnel; and availability of services.

HRS had in mind the provisions of Rule 22-7.44(3), Florida Administrative Code, which requires Medicare certification and licensure as a precondition to the ability to offer home health agency service to Medicaid recipients, when they sought the enactment of Subsection (f) to the proposed rule. This provision within the proposed rule contemplates the 900 visit limitation based upon the assumption that 90% of the expected provision of home health service by the county, based on an average agency size of 9,000, will be attributed to non-Medicare eligible patients such as Medicaid recipients and other persons who are indigent, with 10% of the subject 9000 being provided to Medicare patients. In the Medicaid setting skilled nursing and home health aide visits are paid for. Typically, Medicaid reimbursements do not cover the actual cost of services provided. This provision exempts the county health units from the review contemplated by the balance of the proposed rule and excludes as many as 900 Medicare visits per county from service by providers other than the county health units. These

county units would not be included in the inventory of agencies in terms of license holders. While there is a need to address the matter of provision of care to Medicaid eligible recipients and indigents as a general class of patient, Subsection 14(f) to the proposed rule does not accomplish this end. Having no other justification than assisting the indigent, the enactment of this subsection cannot be supported or sustained. As a means to that end there is no reason to believe that a home health agency with the limitation placed upon the number of Medicare visits that it may offer can maintain success in the market place, and without success its value to the indigent patient is so restrictive that it is not worthwhile.

III. Other Considerations

51. While the rule states its intention to foster competition, it will not promote this competition.

52. The economic impact statement fails to adequately address the implications of the rule as it is applied to the existing providers with opportunities for service in multiple districts and to new applicants for certificates of need.

53. The Department's rules are expected to conform to the State Health Plan. The 1985-1987 State Health Plan envisions the idea of promotion of competition with reasonable economies of scale by 1987. The present rule under challenge does not achieve that end.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the subject matter and the parties to this proceeding in accordance with Chapter 120, Florida Statutes.

2. The Petitioners offered a timely challenge to the proposed Rule 10-5.11(14), Florida Administrative Code, and Intervenors made timely intervention.

3. Petitioners and Intervenors in this cause have standing to participate in this proceeding which examines the validity of proposed Rule 10-5.11(14), Florida Administrative Code, under the authority of Section 120.54(4), Florida Statutes.

4. Ruling was reserved on the request by Upjohn to take official notice of the memorandum of August 1, 1980, by Reyna E. Williamson, Directory, Division of Survey and Certification, Bureau of Health Standards and Quality, Department of Health and Human Services. Having considered that document, official recognition is denied.

5. The challenges which have been lodged against the proposed rule

are couched in terms of claims that this rule is inconsistent with delegated legislative authority set forth in Chapter 381, Florida Statutes; is contrary to Chapter 400, Florida Statutes, related to home health agency licensing; is not in accord with the State Health Plan; is arbitrary and capricious in its effect; is procedurally defective; and contains an inadequate economic impact statement. Moreover, the rule is alleged to deprive the existing providers with so-called "cross-over rights" of their property without due process of law.

6. In considering the challenges to proposed Rule 10-5.11(4), Florida Administrative Code, the decision of *Agrico Chemical Company v. Department of Environmental Regulation*, 365 So. 2d 759 (Fla. 1st DCA 1979) is relied upon. That opinion establishes the fact that the challengers to the rule must carry the burden of proof by a preponderance of evidence. That decision identifies the fact that Section 120.54(4), Florida Statutes, contemplates the ability to comment on the rule's acceptability in examining whether the rule is an invalid exercise of delegated legislative authority. The decision also relates the fact that the rule may be examined to determine if it is arbitrary and capricious. A capricious action is seen to be one that does not carry with it adequate thought or reasoning or rationality. Arbitrariness in the decision making process occurs when the outcome of the rule enactment is not borne out by facts or logic. When examined with this guidance, proposed Rule 10-5.11(14), Florida Administrative Code, fails to comport with its stated rulemaking authority found at Section 381.494(5), (7) and (8) and 381.031(1)(g)11., Florida Statutes, and the law it is said to implement, i.e., Section 381.494(7), Florida Statutes. Nor is the rule found to comport with the applicable provisions of Chapter 400, Florida Statutes. In exercising the authority set forth in those statutes, HRS has done so in an invalid manner. The rule in question is likewise arbitrary and capricious in its effect. While great latitude or discretion is afforded to an agency in the exercise of its rulemaking authority and should not be overturned unless there is clearly erroneous construction of the statutes, that quality of deference cannot be given to HRS on this occasion. The rule at issue is not reasonably related to the purposes which the legislature had in mind in regulating home health agencies. It was not incumbent upon HRS to enact a rule which was the only possible interpretation or the most desirable interpretation of the statutory mandates. It was only necessary to offer a rule which was in the range of permissible interpretations of that mandate. The rule at issue is not a permissible interpretation. See *Department of Professional Regulation, Board of Medical Examiners v. Durrani*, 455 So.2d 515 (Fla. 1st DCA 1984).

7. The suggestion by HRS that it has sought the input of an assortment of interested parties in fashioning the present rule and has concluded with a product which is sensitive to the needs of the home health industry cannot be found in this record. While the pursuit of the rules promulgation was impressive in the sense of gaining the participation of the industry, the final outcome cannot be sustained.

8. The proposed rule does not foster or promote competition as envisioned by Chapter 381, Florida Statutes, and the 1985-1987 State Health Plan. Subsection 14(a) to the proposed rule through the contribution of a so-called "C" factor stifles competition without justification. Therefore, it is an invalid exercise of the legislative authority and is arbitrary and capricious for reasons more completely described in the findings of fact. In addition, the arrangement contemplated by the formula found in Subsection 14(a) in describing "S" the number of expected Medicare visits per year per agency is contrary to the statutory authority and is arbitrary and capricious. Likewise, the idea of rounding down to the nearest whole number is trying to describe the gross number of home health agencies to be allocated in the relevant service district is contrary to the applicable statutes and is arbitrary and capricious. The use of 1982 data to describe utilization, without regard for trends showing an increased utilization of home health services, which call for the use of the most up-to-date information, cannot be reconciled with statutory authority and is also found to be arbitrary and capricious. This arrangement is made the more bewildering given the agency's intention to use up-to-date population figures in conjunction with the fixed data from 1982. Finally, there is an inherent error within the data in the effort to describe the projected district population of persons 65 years of age or older who are using Medicare. That pertains to the factor .0496 which should be .0506.

9. As described in the findings of fact, Subsection 14(b) to the proposed rule in its state intent to use population figures from the spring Florida Revenue Estimating Conference in effect at the application submission deadline is contrary to Section 120.54(8), Florida Statutes. The rule may not incorporate materials that do not exist on the date that the rule is adopted. This provision of the rule contravenes that prohibition.

10. For reasons as discussed in the finding of fact, Subsections 14(c) and (d) of the proposed rule are contrary to Chapter 381, Florida Statutes, in that they are an invalid exercise of legislative authority and are arbitrary and capricious in nature. While it is acceptable to establish district wide home health agencies, the plan contemplated in these provisions of the proposed rule is not acceptable. Of particular

concern is the matter of the creation of the right of the Local Health Councils to establish subdistricts, followed by arbitrary limitations on existing providers in their efforts to offer services based upon some idea of a monopolistic outcome should the existing providers be able to expand their base of operation in a given subdistrict. This philosophy is not supported in the record and fails to take into account the opportunity for HRS to scrutinize an existing provider's attempt to open up additional agencies or sub units within a subdistrict.

11. Subsection 14(e) to the proposed rule is unclear in terms of the true meaning of expedited review. It is uncertain whether those home health agencies presently licensed to serve multiple districts would be examined through a comparative hearing under the guise of expedited review and whether they would be examined in keeping with a literal interpretation of the methodology set forth in Subsection 14(a). The provision of multiple district agencies also allows an expansion of service without regard for the past history of service within the "crossover" district and allows for service in a greater geographical area than contemplated by their present licenses. These opportunities, if pursued, would adversely affect the rights of new applicants for certificate of need with no apparent benefit to the consumer of health services. Those consumers would be deprived of a review in which existing providers who wanted to expand into new areas were required to compete with new applicants who desire to serve those same areas. This provision also contemplates the mandatory surrender of license opportunities held by the existing providers who are authorized to serve multiple districts, without recourse to minimal due process. Those property rights of the present license owners are further infringed when considering the fact that in order to gain the substitute license it is necessary to establish a physical presence in the adjacent service district, whether that physical presence existed in the past or not. Subsection 14(e) of the proposed rule cannot be seen as carrying forward the intent of the legislature set forth in Chapter 381, Florida Statutes, and the subsection is found to be arbitrary and capricious.

12. Subsection 14(f) to the proposed rule is an invalid exercise of legislative authority, in that it is contrary to Chapter 381, Florida Statutes, and is arbitrary and capricious. The principal purpose of the certification and licensure of home health agencies is the regulation of providers who seek Medicare reimbursement. This arrangement carries with it the possibility of serving Medicaid patients, in that licensure to provide home health care to Medicare recipients is a prerequisite to the ability to seek reimbursement for services rendered to Medicaid patients. Unquestionably there is a problem of providing adequate assis-

271

tance to Medicaid patients and other indigent patients. On this occasion the motives of the Department are commendable; however, Subsection 14(f) to the proposed rule does not bear the necessary relationship to the purposes of Chapter 381, Florida Statutes, pertaining to the provision of home health to Medicare recipients to uphold the Department's choice of rule enactment. Neither can it be seen as posing any reasonable basis for success in the difficult task of responding to the needs of the indigent.

13. The economic impact statement is provided is inadequate. It does not establish that an adequate assessment was made of the influence of this proposed rule on health care costs, implications to existing providers and to new applicants.

14. HRS had set out to enact a new Rule 10-5.11(14), Florida Administrative Code, and by that effort overcome the criticism set forth by the court in *Department of Health and Rehabilitative Services vs. Johnson and Johnson Home Health Care, Inc.*, supra. The present attempt has not met that goal.

In view of the facts found and the conclusions of law reached, it is

ORDERED:

Proposed Rule 10-5.11(14), Florida Administrative Code, is an invalid exercise of delegated legislative authority.

DONE AND ENTERED this 12th day of March, 1986, in Tallahassee, Florida.